**FROST v. UNITED STATES (two cases).**
**Civ. A. Nos. 1749, 1840.**

District Court, W. D. Louisiana,
Shreveport Division.

May 18, 1947.

Lee & Emery, of Shreveport, La., for plaintiffs.

Malcolm E. Lafargue, U. S. Atty., and Wm. J. Fleniken, Asst. U. S. Atty., both of Shreveport, La., for defendant.

DAWKINS, District Judge.

These cases were consolidated for the purposes of trial. For the year 1940 plaintiffs reported and filed individual income tax returns, which included dividends paid by the Frost Lumber Industries, Inc., a Missouri corporation, hereafter called the Missouri Company, amounting, for each, to the sum of $45,501. In addition, the husband received, as head of the community of acquets and gains, under the Louisiana law, as a life beneficiary, from W. J. Paulk and State National Bank of Texarkana, Arkansas, as trustees, the sum of $6,503.56, in which was included the sum of $3,617.50, likewise representing dividends paid on stock of the Missouri Company. One-half of this latter sum of $1,808.75 was included

and reported by each of the plaintiffs in their income tax returns for 1940. The wife also received and reported from a trust, created in her favor by the husband, the sum of $7,067.67, representing dividends on stock of the Missouri Company, held by said trust.

The husband and wife during the year 1940 held individually 7738 and 1367 shares respectively of the stock of the said Missouri Company, of which there was outstanding total stock of 60,000 shares of the par value of $100. The husband was president of this corporation.

The Missouri Company owned all the outstanding stock of the Union Sawmill Company, an Arkansas corporation, hereafter called the Arkansas Company, as well as all outstanding stock of the Frost Lumber Industries, Inc., of Texas, a Texas corporation, hereafter called the Texas Company.

On February 10, 1944, plaintiffs, husband and wife, filed individual claims for the refunding of their income taxes, amounting to the sums of $22,597.89 and $27,568.13, respectively, giving as a basis in both instances the following: "A large portion of taxpayer and his wife's income, in community, is derived from dividends from Frost Lumber Industries, Inc. Said corporation has for some time been endeavoring to have the Commissioner of Internal Revenue determine what portion of said dividends are taxable and what portion represent return of capital. The Statute of Limitation will shortly run, against taxpayer's 1940 return, therefore he at this time files this blanket claim for refund of all the tax paid for that year, same to be later properly determined by The Commissioner. The dividends from Perfection Oak Flooring Company, Inc. (now Frost Hardwood Floors, Inc.), is in the same classification."

Upon a review of the returns, in response to these claims, the Collector found that the sum of $2,627.77, principal and interest, should be refunded to the husband, and the sum of $3,296.45, principal and interest, should be repaid to the wife, but otherwise denied the claims. The amounts thus found to be proper refunds were

under a formula by which the Collector determined that 90.845 per cent of the total dividend declared by the Missouri Company of $597,788 was taxable income of the corporation, and that 9.155 per cent of said dividend was nontaxable and should be attributed to capital.

It was and is contended by plaintiffs that a proper application of the law to the facts in these cases justifies the conclusion that not more than 62.23441 per cent of the total dividend of the Missouri Company was taxable, and that 37.76559 per cent was nontaxable. Accordingly, plaintiffs have sued for the difference between the amounts which would be due under their contention and the sums awarded by the Collector under the percentages of nontaxable portions of the dividend stated. The demands are for the sums of $6,663.40 and $8,607.18 for the husband and wife, respectively.

The controversy turns upon the point as to whether monies received from the Arkansas and Texas Companies should be treated as income, or should be applied to indebtedness due the Missouri or parent corporation, thereby leaving for taxation only the earnings of the parent for the year 1940.

The Collector's figures showed "total earnings available for dividends $543,058.-00", but that the distribution in dividends had been at the rate of $10 or the total sum of $597,788, or $54,730 more than the actual earnings for the year 1940 by the three companies. He further attributed the latter sum to payment from capital and apportioned the taxable and nontaxable percentages of the dividends paid the plaintiffs in these cases according to those figures. It is the contention of the plaintiffs that the net income of the Missouri Company was the sum of $372,029.84 and was the gross sum subject to taxation; and that all the monies, amounting to $171,028.35, received from the two subsidiaries, the Arkansas and Texas Companies, should be applied to their indebtedness and hence the remainder of the total dividend declared of $597,788 or the sum of $225,758.16 should be held to be nontaxable. Plaintiffs also contend that all the earnings of the Missouri Company, since March 1, 1913,

up to and including December 31, 1939, the year immediately preceding the taxable period in question, 1940, had been disbursed by the parent company and the only source from which the amount of the dividend declared in the latter year, in excess of $372,-029.84 could have been paid was "out of whatever surplus there was on February 28, 1913."

Both the Arkansas and Texas Companies filed income tax returns for the year 1940, the former reporting taxable income of $177,079.95 and the Texas Company showing a deficit with no income taxes due. Prior to December 31, 1936, the Missouri Company operated the two subsidiaries, the Arkansas and Texas Companies, as branches of its own business, receiving and selling all their products, absorbing the proceeds as well as the expenses and losses when such occurred. No separate records, books or bank accounts were kept for these subsidiaries except such as were necessary to operations of the mills owned by them, in meeting payrolls, purchasing timber, etc.

In 1929, Pope's Dig. § 14024 et seq., an income tax was imposed in the state of Arkansas and in 1935 the income tax law of Louisiana became effective. Act No. 21 of 1934. The condition of the books, in which the records of the parent and subsidiaries were kept, was such that the accountant who looked after income tax matters for the whole group, found it very difficult to segregate the business of the Arkansas and Texas Companies from those of the parent or Missouri Company. For this reason he "prevailed on the management to separate the three corporations" and to set them up as three separate corporate entities with their own books, so they could deal with one another accordingly in their bookkeeping. As of January 1, 1937, therefore, "there was a complete divorcement" of these companies. Their books showed separate assets and liabilities, including accounts receivable and accounts payable. Prior to that time, the books did not disclose the amounts of the investments by the Missouri Company in the capital stock of the subsidiaries. In the new set-up the figures showed not only those investments, but "monies that had been expended for lands, timber, and properties, and things

of that character—advances for operating costs and a counter entry was made on the subsidiaries' books—was set up as a liability by the subsidiary to the parent company and the subsidiaries' books were brought up separately." Since that date they have been operated as separate corporations, made payments on accounts, borrowed monies from the parent company and credits and debits have accordingly been entered on the records of the parent. See testimony of accountant, J. B. McGuire, pp. 33 and 34 of the note of evidence.

The mills in Louisiana were owned and operated by the parent or Missouri Company.

The witness, McGuire, at no time audited the books of any of the companies. These books and records were always accepted as correct by the Government. Prior to 1936 no dividends were ever declared in favor of the parent by the subsidiary corporations. The first dividend by the subsidiaries was declared in 1936, because of an amendment to the Revenue Law of the United States, which imposed a tax on undistributed profits, and the subsidiaries, for that reason, accounted for their profits as having gone from the Arkansas and Texas Companies to the parent company by formal declaration of dividends by the boards of directors, certified copies of which minutes were attached to the returns of the subsidiaries and the parent company, Frost Lumber Industries of Missouri. The latter classified these dividends "as income on its return as received from the wholly owned subsidiaries, along with all other dividends which it actually received and cashed from other corporations in which it owned stock." The witness was unable to state how long this practice of declaring dividends by formal action of the boards of directors of the subsidiaries after the monies had previously gone into the hands of the parent, continued, but testified that in all instances where such dividends were declared, the same was done by formal action of the boards of directors.

The dividend for 1936 was declared from the credits which the subsidiaries had with the parent corporation or by means of a bookkeeping entry. The parent company had in its possession at that time funds arising from the sale of lumber products by the subsidiaries. Whatever funds were to the credit of the subsidiaries were available at all times for operations, the purchasing of timber and equipment, etc. The subsidiaries did not in 1936 actually distribute to the parent any of its funds by check but the amounts thereof were charged to it upon their books. In setting up the separate books for each corporation as of January 1, 1937, the debits and credits arising from accounts receivable and accounts payable, including sales of lumber, etc. were carried into the surplus account of the parent company. The dividends that were declared by that company subsequently were on exactly the same basis as those for 1936 described above in so far as the witness, McGuire, was able to say. He was also able to throw very little light on Exhibits B and C, photostatic copies of entries on the journal of the books, setting up assets and liabilities of the subsidiaries as of January 1, 1937, that is, as to whether the principal amounts thereon represented accounts payable from investments, nor could he explain where or how the items entered as "surplus" came from. As the result of his contact with the officers of the several corporations, in his work of looking after their income tax returns, McGuire was, to that extent, familiar with their operations for years subsequent to 1936, including the year in question, 1940. Just as it had for the years prior to 1936, the parent company continued to handle the lumber sales of these subsidiaries and the latter maintained bank accounts only to the extent necessary for their mill operations, as had been done before. The principal bank account was maintained by the parent company, in which it deposited the proceeds of sales, etc., to its own account. It never made remittances for the proceeds of sales, as such to the subsidiaries. It simply made available to the subsidiaries such funds as might be needed for operations. "In other words it was the banker and financial provider for all these corporations." The subsidiaries had their own officers and directors, some of whom in different relations were likewise officers and directors of the parent. The same bookkeeper kept the records of all orders for lumber, regardless

of which company produced it, which were filled and invoiced to the purchasers in the name of the parent or Missouri Company.

On cross-examination, the following questions were asked and answered by McGuire:

"Q. Will you tell the court what actual changes were effected beginning with January 1, 1937, between the operations of the parent company with relation to these two subsidiaries that had not theretofore been effected? A. It was merely a matter of bookkeeping, and that is the separating and making the three sets of books. Insofar as all the general operations in the office were concerned, it was probably carried on in the same way and sales were handled the same and the management was the same.

"Q. Were the funds handled the same? A. I presume they were; yes, sir."

The surplus account maintained on the parent company's books for 1940 did not reflect any profit or loss arising from transactions for the accounts of the subsidiaries. The only matters as to which the witness testified were those accounts that reflected profit and loss for the subsidiaries for the years 1936 and 1937, when they had to comply with the law taxing undivided profits. For these years the amounts received from their operations by the parent company were formally declared as dividends in its favor. On redirect examination McGuire testified that, while sales of lumber were handled through the sales office of the parent company, ultimately the subsidiaries would be credited on the books of the parent with the full sales price, without profit to the Missouri Company. After January 1, 1937, monies advanced to the subsidiaries were also charged to them on the books of the Missouri Company, and if there was a loss on sales the same would be charged to the subsidiaries, and they were credited with the profits. The witness also stated that there was no difference in the way the business of the subsidiaries was handled from that of other independent concerns, in which the parent owned no interest. Profits from the sale of lumber by the outside companies were also deposited in the bank account of the

Missouri Company but remittances were made to them when called for. The Missouri Company had no specific authority for making such deposits for either the independent companies or the subsidiaries. It will thus be seen that there is some apparent inconsistency in the statements on direct and cross-examination.

McGuire finally testified that there was no time after January 1, 1937, up to and including the year 1940, when the accounts of the subsidiaries from the sales of lumber, upon the parent company's books, were sufficient to discharge their indebtedness to it, whether treated as an "investment or accounts receivable, so as to make the parent company owe the subsidiary." See note of evidence p.98 et seq.

The stipulations in these cases contain no statement as to amounts of indebtedness due by the subsidiaries as to the parent company, or as to how funds received from them were applied—that is, whether in settlement due by them, or as dividends on their capital stock held by the Missouri Company. In order to constitute payments upon account, it was necessary, first, that such indebtedness be established with reasonable certainty, and second, that the monies arising from the sales of their products made by the parent, by agreement, express or implied, were credited thereon, and that they were not sufficient to leave any balance to be attributed to dividends upon the stock, all of which was owned by the Missouri Company. Of course, in those years in which the subsidiaries declared as dividends (for the purposes of state income taxes) the funds belonging to them in the hands of the parent company, it was also necessary that this be done with the consent of the latter, unless such dividends represented only the net profits of their operations, after charging them with advances or expenses paid by the Missouri Company for the current year. There is no evidence in this record as to how those funds were treated, even on the books of the parent company. It is true that McGuire testified that, after the separation of the records of the Missouri Company and those of the Arkansas and Texas Companies, each carried accounts payable and accounts receivable as against the others,

but this witness frankly admitted that he at no time attempted to audit any of the books for the purpose of determining their correctness. His job was to look after their several income tax matters and he stated that the records of these taxpayers were uniformly accepted by the Government without question.

For the year 1940, the subsidiaries, the Arkansas and Texas Companies, made their own income tax returns to the Government, the former showing a substantial net subject to taxation, and the latter, a deficit. This required that they take credit for all expenses of operation or doing business, including any sums advanced in that year by the parent company, before arriving at a net profit, taxable as income. However, this did not include any indebtedness for earlier years to which the funds in the hands of the parent might have been applied. In other words, the parent company could not apply to indebtedness funds received by it from the subsidiaries as dividends upon the stock, any more than it could receive payment upon account and then treat the same as a dividend upon the stock of the subsidiaries. The two methods of handling the matter are contradictory, and could not be used at the same time, when dealing with the same funds, except as to any excess above indebtedness.

■ The burden was upon the plaintiffs in these cases to prove by a fair preponderance of the evidence that the refunds claimed were not due to the Government. The fact that they included all the dividends from the stock of the Missouri Company as income and waited approximately four years before claiming any part thereof as refunds, creates a strong presumption that, in keeping with practices of earlier years, they were still treating these subsidiaries' operations as their own, notwithstanding the separation as a matter of bookkeeping of accounts for state income tax purposes. Of course, the payment of income taxes by the Arkansas and Texas Companies, either state or national, would not necessarily determine whether the monies received by the Missouri Company were payments of indebtedness or of dividends, although it was required that amounts paid as expenses of the current year should be considered in ascertaining net profits or income for the year 1940.

My conclusion is that plaintiffs have failed to prove their demands.

Proper decree should be presented.